IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| J.T., individually and as next friend of M.L., a minor, | § § § | |
| Plaintiff, | § § | |
| VS. | § § | Civil Action No. 3:20-CV-3443-D |
| | § | |
| UPLIFT EDUCATION, | § § | |
| Defendant. | § § | |

MEMORANDUM OPINION
AND ORDER

Plaintiff J.T., individually and as next friend of her daughter M.L., brings this action against defendant Uplift Education ("Uplift"), alleging that Uplift is liable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), and 42 U.S.C. § 1983 for the sexual abuse and harassment that M.L. suffered as a kindergarten student at the hands of her male classroom teacher, an Uplift employee.[1]  Uplift moves for summary judgment. Despite the tragic facts of this case, the court must faithfully apply the law to the summary judgment record and dismiss the case.  The court therefore grants Uplift's motion and dismisses this action with prejudice.[2]

---

[1] J.T.'s claim under 42 U.S.C. § 1983 is for violating M.L.'s Fourteenth Amendment rights to personal security, bodily integrity, and equal protection.

[2] Some of the briefing and summary judgment evidence has been filed under seal.  The court is not filing this memorandum opinion and order under seal because it does not disclose information that is or should be maintained under seal.

I

During the 2018-2019 school year, M.L. was a kindergarten student at Grand Primary, an open-enrollment college-preparatory public charter school operated by Uplift.[3]  Several times throughout the school year, M.L.'s male classroom teacher, Jamil Wazed ("Wazed"), sexually abused her and several other female students in his class.  To facilitate this abuse, Wazed showed movies to the class, during which he turned off the classroom lights, separated certain children from the remaining ones, and demanded that these students perform sexual acts on him behind a "wall" of privacy folders[4] that he created on his desk. The barrier that Wazed created was roughly three feet wide and two feet high and would have been visible to anyone who glanced in the window of Wazed's classroom.

On August 5, 2019, two days before the beginning of the new school year, A.C. emailed Grand Primary's Academic Director, Chermanda Frazier ("Frazier"), to report that her daughter J.G. had mentioned that Wazed "would kiss her on her neck and that his beard tickled her neck."  D. App. (ECF No. 120-5) at 1342.  J.G. was a female student who had been a kindergartner in Wazed's class during the 2018-2019 school year.  On August 8, 2019 Frazier saw A.C.'s email and immediately responded.  Because the allegation that Wazed

---

[3]The court recounts the facts in the light most favorable to J.T., as the summary judgment nonmovant, and draws all reasonable inferences in her favor.  *See, e.g.*, *Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.).

[4]The privacy folders in this case were blue cardboard dividers sold under the Lakeshore Learning school supply brand.  Grand Primary teachers, including Wazed, used the folders to separate students during testing or when students worked on other guided assignments to minimize cheating and distractions and to give students privacy in the open classroom space.

kissed a student amounted to possible professional misconduct and violated teacher-student boundaries, Frazier immediately placed Wazed on administrative leave. Consequently, he was prohibited him from teaching, interacting with students, and entering Uplift property without invitation and supervision.

The following day, Frazier, together with Grand Primary Deans Yvonne Cooper ("Cooper") and Christian Martinez-Canchola ("Martinez-Canchola") and Social Counselor Catherine Savoie ("Savoie") (collectively, the "Administrators") began an investigation. During the investigation, the Administrators spoke with A.C., who related that, according to J.G., Wazed had kissed her on the neck and would also cuddle with students during story time. Savoie spoke with J.G. and did not observe anything out of the ordinary or hear any reports of inappropriate conduct. The Administrators then spoke with J.G. together. J.G. called Wazed her "favorite teacher," said that she missed him, and stated that Wazed would kiss her on the neck when the students were good. *Id.* at 1281. Neither J.G. nor A.C. reported that Wazed had engaged in any other misconduct.

The Administrators then selected four students from Wazed's 2018-2019 class—female students M.L., J.A., and Y.Q., and male student L.B.[5]—to inquire further about the allegations that Wazed had kissed a student. In M.L.'s conversation with the Administrators, she stated that she missed Wazed and she called him her favorite teacher. To investigate J.G.'s report that Wazed had kissed her as "a reward" when she was "good,"

---

[5]Uplift maintains that the Administrators selected these four students because they had strong verbal skills.

Frazier asked M.L. how Wazed rewarded her when she did well in class and whether he kissed her. M.L. responded that Wazed kissed her on the cheek but not the neck. M.L. did not report that Wazed had engaged in any other misconduct. J.A. told the Administrators that she missed Wazed and that he hugged her, but never kissed her. Y.Q. also said that she missed Wazed and remembered how he taught reading. She stated that he had given her hugs and had kissed her "on the forehead like when you kiss your brain." D. App. (ECF No. 121-3) at 1589. L.B. stated that he missed Wazed but denied that Wazed had ever kissed him.

Grand Primary then asked Wazed to submit a statement responding to the allegation that he had kissed a student. Wazed denied the allegation and stated that he "never kissed a scholar." D. App. (ECF No. 120-5) at 1368.[6] Despite Wazed's denial, Frazier believed the students. She determined that Wazed had acted inappropriately, but not maliciously, when he kissed at least three female students. She then provided Uplift's Human Resources team a draft Employee Relations Investigation Packet in which she recommended that Wazed receive a disciplinary warning regarding violation of standards regarding appropriate physical contact with students. She also recommended that Wazed be allowed to return to teaching after meeting with school leadership to "reiterate the expectations regarding student and staff physical space and touch." *Id.* at 1285.

Uplift's HR Director Gaylon Curry ("Curry") and Managing Director Priscilla Pharms reviewed Frazier's recommendation and rejected it on the ground that Uplift did not tolerate

---

[6]"Scholar" is the term that Uplift uses when referring to one of its students.

*any* inappropriate physical contact with students and terminated employees for *any* physical touching that failed to maintain appropriate boundaries. Curry directed Frazier to revise her report, get a more detailed statement from Wazed, and prepare to terminate him. Frazier did as instructed, and Uplift terminated Wazed's employment on August 16, 2019, eight days after Frazier first saw A.C.'s email.

On August 19, 2019 Uplift reported to the State Board for Educator Certification ("SBEC") that it had terminated Wazed's employment for failure to maintain appropriate educator-student relationships and boundaries. Savoie also filed a report with Child Protective Services ("CPS"), stating that J.G. had disclosed that Wazed had kissed her. CPS screened the report, noted that Wazed had been terminated, and closed the matter after determining that the allegations did not involve abuse, neglect, or risk. Frazier also contacted A.C. to inform her that Uplift no longer employed Wazed and that Uplift had reported his alleged conduct to CPS and SBEC. A.C. did not return Frazier's call.

Nearly one year later, on July 16, 2020, J.T., the plaintiff in this lawsuit, contacted Martinez-Canchola, who had replaced Frazier as Academic Director at Grand Primary. J.T. reported that her daughter M.L. had disclosed to her that "something" had happened with Wazed and that J.T. had filed a police report. J.T. did not provide additional details at that time regarding Wazed's wrongdoing. Later in July, however, the Grand Prairie Police Department notified Uplift that Wazed was under criminal investigation for different and more serious conduct than what had been discovered during Grand Primary's August 2019 investigation. In September 2020 Wazed was arrested and charged with aggravated sexual

assault of a child.  He ultimately pleaded guilty to one count of aggravated sexual assault of a child and was sentenced to seven years in prison.

In November 2020 J.T. filed the instant lawsuit. In her second amended complaint, she brings claims against Uplift under Title IX and § 1983.  Uplift moves for summary judgment on all of J.T.'s claims.[7]  J.T. opposes the motion.  The court has heard oral argument.

II

Where, as here, a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party does so, the nonmovant must go beyond her pleadings and designate specific facts showing there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmovant's failure to produce proof

---

[7]Also pending are J.T.'s motion to strike Uplift's errata sheet, Uplift's motion to exclude opinions of Dr. John F. Doherty, Uplift's motion to exclude opinions of Dr. Robert Cooper, and Uplift's objections to and motion to strike J.T's summary judgment evidence. Because the court has not considered the portions of Frazier's deposition to which Uplift's errata sheet applies, and because the court holds that Uplift is entitled to summary judgment even when considering the relevant expert testimony and summary judgment evidence, the court denies J.T.'s and Uplift's motions without prejudice as moot.

as to any essential element of a claim renders all other facts immaterial.  *See TruGreen*

*Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).

Summary judgment is mandatory if the nonmovant fails to meet this burden.  *Little*, 37 F.3d

at 1076.

III

Uplift moves for summary judgment on J.T.'s Title IX claim.

A

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance."  20 U.S.C.

§ 1681.  An "education program," such as a charter school, that receives federal funds[8] may

be held liable under Title IX via a private action for damages when its employees sexually

abuse students.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).  Title IX,

however, does not create vicarious liability for the acts of school employees.  *Id.* at 288.

Instead, to establish liability, a plaintiff must demonstrate that a school official with authority

to address the harassment had actual knowledge of the harassment or that there was a

substantial risk that harassment would occur, and the school was deliberately indifferent to

such harassment.  *Id.* at 290; *see also Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648,

652-53 (5th Cir. 1997).  A school acts with "deliberate indifference" when its "response to

---

[8]The court will assume *arguendo* that Uplift is an education program receiving Federal financial assistance.  This requirement does not appear to be disputed.

the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).  A school can be deliberately indifferent "before the fact"—i.e., the school has actual knowledge of a substantial risk that sexual abuse or harassment will occur and does not respond reasonably to that risk—or "after the fact"—i.e., after the school has knowledge of abuse or harassment, it does not respond reasonably, and the student suffers further harassment as a result.  *See*, *e.g.*, *King v. S. Methodist Univ.*, 2015 WL 12723026, at *2-3 (N.D. Tex. Apr. 27, 2015) (Solis, J.).

## B

The court begins with J.T.'s "before-the-fact" Title IX claim.  J.T. first contends that, before August 2019, Uplift had "actual knowledge" that Wazed was sexually abusing M.L. "from a teaching assistant who informed appropriate school officials of the abuse."  P. Br. (ECF No. 138) at 8.  In support, J.T. points to M.L.'s testimony that Jazmyne Walker ("Walker"), an Uplift Teacher Aide, entered Wazed's classroom while he was abusing M.L. and undoubtedly "noticed" the abuse, and that "other teachers saw the abuse occurring as they walked by the classroom."  *Id.*

J.T. does not contend that Walker or any of the unidentified "other teachers" who allegedly observed the abuse is an "appropriate person" under Title IX.[9]  *See Gebser*, 524

---

[9]In fact, J.T. acknowledges in her response brief that "low-level school employees, including teachers and school peace officers, do not qualify as appropriate school officials themselves."  P. Br. (ECF No. 138) at 10 (internal quotation marks, brackets, and italics omitted).

U.S. at 290 ("An 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination.").  She maintains instead that Walker and the other teachers had an obligation under Texas law to report to law enforcement any sexual abuse they observed, and an obligation under Uplift policies to report any knowledge or suspicion of student abuse or sexual harassment.  J.T. posits that "it is well established that when a witness to sexual harassment *must* report sexual harassment to an appropriate school official as a 'mandatory reporter of sexual abuse' under state law, a reasonable factfinder could infer that the witness *did* inform appropriate school officials of the sexual harassment."  P. Br. (ECF No. 138) at 9 (quoting *B.W. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F.Supp.3d 859, 879 (M.D. Pa. 2019)).  The court disagrees.

Title IX's knowledge requirement "cannot be satisfied by showing that the school district *should have known* there was a substantial risk of abuse."  *M.E. v. Alvin Indep. Sch. Dist.*, 840 Fed. Appx. 773, 775 (5th Cir. 2020) (per curiam) (emphasis added).  "[A]ctual knowledge[] means that the school must have actual, not constructive, knowledge of sexual harassment."  *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (citations omitted).  "Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a 'substantial risk that sexual abuse would occur.'"  *Id.* (quoting *M.E.*, 840 Fed. Appx. at 775).  Accordingly, liability under Title IX requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference."  *Rosa H.*, 106 F.3d at 658 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

J.T. has not produced any evidence that would enable a reasonable jury to find that, before August 2019, an appropriate Uplift official had actual knowledge that Wazed had sexually abused his students. And based solely on evidence that Walker and "other teachers" witnessed the abuse, a reasonable jury could not infer that an appropriate Uplift official also had actual knowledge of the abuse.[10]

C

J.T. next argues that Uplift had "actual knowledge" that there was a substantial risk that Wazed would sexually abuse his students.

J.T. maintains that the "evidence raises a triable issue of fact that appropriate school officials had actual knowledge of Wazed's habitually darkened room, his privacy-folder wall, and the obvious risk of sexual abuse they presented." P. Br. (ECF No. 138) at 15. In support of this contention, she points to evidence that Wazed admitted that he deliberately created a dark and secluded classroom environment that provided him cover to molest little girls; that

---

[10]In support of her novel theory of imputed knowledge, J.T. cites *B.W.*, 422 F.Supp.3d 859, and *Doe v. Loyalsock Township School District*, 2022 WL 1110310 (M.D. Pa. Apr. 13, 2022). But both of these cases were decided at the pleadings stage, and in both the plaintiffs alleged that an appropriate official had *actual knowledge* of the abuse. *See B.W.*, 422 F.Supp.3d at 879 (denying motion to dismiss Title IX claim where, *inter alia*, plaintiff alleged that a teacher, "in accordance with his mandatory reporting duty under 23 Pa. C.S.A § 6311 *did report Mr. Humphrey's behavior to the administrators* of [CTC] and [the school districts], but no action was taken.'" (alteration in original) (emphasis added)); *Doe*, 2022 WL 1110310, at *5 (denying motion to dismiss Title IX claim where plaintiff alleged that basketball coach's "inappropriate relationship with [her] *was known to the staff and administration* of Loyalsock," (alteration in original) (emphasis added), and also alleged facts that reasonably suggested that high school principal "possessed knowledge about the danger [coach] posed to [plaintiff] and other children."). Neither court inferred the awareness of an appropriate official based on a different mandatory reporter's knowledge.

Wazed admitted to frequently showing educational movies to his class and turning the lights off during these movies in order to distract the other students so that he could molest little girls; that Wazed admitted using the privacy folders he had placed on his desk to create a barrier that was roughly three feet wide and two feet high; that Wazed and M.L. both acknowledged that the dimmed lights in Wazed's classroom and the wall of bright blue privacy folders that he placed on his table during the abuse would have been visibly obvious to anyone outside the classroom and could have been seen through the large two-feet-wide window of his classroom door; that Wazed and M.L. confirmed that appropriate officials routinely walked the halls and visited classrooms and would have walked by while the lights were dimmed and the privacy-folder wall was erected; that Frazier's office door was fewer than 100 feet from Wazed's classroom; that other administrators admitted that they also did check-ins and patrolled the halls in the afternoons; that Wazed's abuse was far more frequent and long-lasting, involving more victims, over a longer duration of time, and involved far more egregious and deviant acts that Wazed himself admits; and that Wazed admitted that, based on how frequently Uplift officials "walked the halls," and how frequently he abused his students, "some someone 'with authority to engage in management level decisions at the school' would have 'definitely' seen his dimmed lights and privacy folders," *id*. at 17.

It is clearly established in the Fifth Circuit that "when a teacher sexually abuses a student, the student cannot recover from the school district under Title IX unless the school district actually knew that there was a substantial risk that sexual abuse would occur." *Rosa H.*, 106 F.3d at 652-53. As set out above, the "knowledge requirement cannot be satisfied

by showing that the school district *should have known* there was a substantial risk of abuse."
*M.E.*, 840 Fed. Appx. at 775 (emphasis added).  Instead, "Title IX requires a showing of
actual, intentional discrimination on the part of the school district."  *Rosa H.*, 106 F.3d at
657.

Based on the summary judgment evidence, the court holds that a reasonable jury could
not find that an "appropriate person" had actual knowledge that there was a substantial risk
that Wazed would sexually abuse his students.  At most, the evidence supports the reasonable
inference that an appropriate person *could have observed* that the lights in Wazed's
classroom were frequently dimmed, or, if he or she walked by Wazed's classroom at the time
he was sexually abusing a student, *could have observed* that Wazed had set up privacy
folders on his desk to create a barrier.  But J.T. has not pointed to any evidence that would
enable a reasonable jury to find that an appropriate person *actually observed* either of these
conditions.  M.L.'s and Wazed's speculation that "someone" who walked past Wazed's
classroom must have noticed that the lights were dimmed and the privacy folders were
arranged around the desk is insufficient to withstand summary judgment.  The fact that the
classroom conditions themselves were open and obvious is alone insufficient to enable a
reasonable jury to find that Frazier or another "appropriate person" actually knew about
them.

Moreover, even if the court assumes *arguendo* that Frazier or another "appropriate
person" *did* observe the lights dimmed and/or the privacy folders arranged around the desk
in Wazed's classroom, this would not of itself permit the reasonable finding that an

appropriate person knew there was a substantial risk that Wazed would sexually abuse a student.  There are valid educational reasons both for dimming classroom lights (for instance, to show educational movies) and for using privacy folders (to address potential cheating and distractions and to give students privacy).  Knowledge that Wazed had dimmed the lights and placed privacy folders on his desk does not necessarily equate to knowledge that Wazed had sexually abused one or more of his students.

"A Title IX plaintiff seeking damages through an implied right of action must clear a high bar on the issue of . . . knowledge of the claimed discrimination."  *Howell v. Austin Indep. Sch. Dist.*, 323 Fed. Appx. 294, 295 (5th Cir. 2009) (per curiam).  In this case, "[t]here may have been, as plaintiff[] contend[s], 'red flags' that should have alerted the district of a substantial risk that [Wazed] was sexually assaulting [M.L.  But the law requires that the district actually knew of the risk, not just that it should have known."  *M.E.*, 840 Fed. Appx at 776 (citing *Rosa H*., 106 F.3d at 652-53, 656).  The summary judgment evidence in this case is insufficient to enable a reasonable jury to find actual knowledge of that risk.

D

The court now turns to J.T.'s "after-the-fact" Title IX claim.

In *J.T. v. Uplift Education* (*J.T. II*), 2022 WL 283022 (N.D. Tex. Jan. 31, 2022) (Fitzwater, J.), the court dismissed J.T.'s Title IX claim based on deliberate indifference after the fact "without prejudice to reconsidering this ruling if the case law develops favorably to J.T.'s position."  *Id* at *2.  The court explained:

- 13 -

> The allegations of the [second amended complaint ("SAC")] only permit the court to draw the reasonable inference that Wazed's harassment of M.L. stopped completely with his termination, even if the deleterious effects likely continued unabated.  So far as the court is aware, to be held liable under Title IX, a funding recipient, like Uplift, who does not directly engage in harassment must subject its students to harassment through its deliberate indifference.  *See, e.g., Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999).  At a minimum, this deliberate indifference must cause its students to undergo harassment or make them liable or vulnerable to it.  *Id.*  But the SAC does not complain that Uplift caused M.L. to undergo harassment or made her liable or vulnerable to it after Wazed was discharged; it alleges that Uplift's acts or omissions subjected M.L. to the *effects* of harassment that she had already suffered due to before-the-fact deliberate indifference.

*Id.*

In her response to Uplift's summary judgment motion, J.T. urges the court to reconsider its ruling in *J.T. II* on the ground that the evidence that has developed through discovery confirms Uplift's deliberate refusal to disclose the abuse it fostered and its conscious decision to cover up that abuse, and that the case law that has developed since *J.T. II* was decided confirms that Uplift's acts and omissions constitute deliberate indifference to sexual abuse and are actionable under Title IX.  The court disagrees.

J.T. argues that the proper standard of deliberate indifference in the context of teacher-on-student harassment does not come from *Davis*, as this court held in *J.T. II*,[11] but instead

_____

[11]The court is aware that, after it decided *Uplift II*, the Sixth Circuit held in *Wamer v. University of Toledo*, 27 F.4th 461 (6th Cir. 2022), that *Davis'* requirement that the school's deliberate indifference "must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it," *Davis*, 526 U.S. at 645, is inapplicable in the context of teacher-on-student sexual harassment.  *Wamer*, 27 F.4th at 469-70 (concluding that

- 14 -

comes from *Gebser*, which "requires a school confronted with credible allegations of teacher-on-student sexual abuse to do more than merely 'do no further harm' by terminating the abusive teacher and halting the harassing conduct." P. Br. (ECF No. 138) at 23. J.T. contends that *Gebser* requires that "[t]he school must go further, taking affirmative action to 'remedy the violation,'" and that "the correct 'remedial action' will require the school to do whatever '[is] deem[ed] necessary' to 'overcome the effects of the discrimination.'" *Id.* (alteration in original) (quoting *Gebser*, 524 U.S. at 288).

In *Gebser* the Supreme Court was principally concerned with the question whether a Title IX plaintiff could recover damages "against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official." *Gebser*, 524 U.S. at 285. To answer that question, the Court was guided by "important clues" in the statute, such as the

---

"requirement that 'the injury is attributable to . . . post-actual-knowledge *further* harassment' . . . should not apply in the context of teacher-student harassment claims."). This court, of course, is not bound by decisions of the Sixth Circuit. But even if it were inclined to agree with the approach taken in *Wamer*, the Sixth Circuit court held in that case:

> a plaintiff can satisfy the causation requirement by showing that (1) following the school's unreasonable response (2) (a) the plaintiff experienced an additional instance of harassment or (b) an objectively reasonable fear of further harassment caused the plaintiff to take specific reasonable actions to avoid harassment, which deprived the plaintiff of the educational opportunities available to other students.

*Id.* at 471. There is no suggestion in the instant case that, following Uplift's allegedly unreasonable response, M.L. had an objectively reasonable fear of further harassment.

requirement in 20 U.S.C. § 1682 that "no [administrative enforcement] action shall be taken until the department or agency concerned has advised the person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id.* at 288 (quoting 20 U.S.C. § 1682).  The Court noted that, "[i]n the event of a violation, a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.  *Id.* (alterations in original) (quoting 34 C.F.R. § 106.3(a)).[12]  The Court concluded that "[i]t would be unsound . . . for a statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance while a judicially *implied* system of enforcement permits substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice." *Id.* at 289.

The *Gebser* Court did *not* hold, as J.T. argues, that Title IX requires a school to do "whatever is deemed necessary" to overcome the effects of the discrimination.  P. Br. (ECF No. 138) at 23 (brackets omitted).  J.T.'s reliance on language in *Gebser* that quotes a U.S. Department of Education regulation is therefore misplaced.   In the *administrative enforcement context*, a recipient that is given notice of a Title IX violation may be required

---

[12]34 C.F.R. § 106.3(a) provides:

> [i]f the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part, such recipient must take such remedial action as the Assistant Secretary deems necessary to remedy the violation, consistent with 20 U.S.C. 1682.

to "take such remedial action as the Assistant Secretary deems necessary to remedy the violation."  34 C.F.R. § 106.3(a).  But neither Title IX nor the case law interpreting it imposes a similar requirement on recipients outside the administrative enforcement context. In fact, in *Gebser*, in response to the plaintiff's argument that the school district had violated Title IX by failing to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims, the Court expressly stated that it had never held "that the implied private right of action under Title IX allows recovery in damages for violation of . . . administrative requirements."  *Gebser*, 524 U.S. at 292.

Nor is this court persuaded by J.T.'s argument that "[l]ower courts have acknowledged that *Gebser* requires schools to do more than merely fire the offending teacher to remedy a Title IX violation, and must 'remedy the violation' by 'tak[ing] steps not only to end the harassment' but to 'remedy its effects.'" P. Br. (ECF No. 138) at 24 (citation omitted).  The only case that J.T. cites in support of her position is *Doe v. Russell County School Board*, 292 F.Supp.3d 690, 710 (W.D. Va. 2018).  In that case the district court held that there was "sufficient evidence from which a jury could conclude that the School Board acted with deliberate indifference to [custodian's] confessed abuse of Doe by failing to offer counseling or other remedial measures to Doe." *Doe*, 292 F.Supp.3d at 710.  In reaching this decision, however, the court relied heavily on guidance from the U.S. Department of Education, which it conceded "represent[s] [Department] policy in the context of *administrative enforcement actions* rather than private lawsuits." *Id.* (emphasis added).  This court does not find *Doe* persuasive, and in its research it has located no similar cases within

the Fifth Circuit.  *Cf. B.W.*, 422 F.Supp.3d at 884-85 (holding that plaintiffs cannot hold

defendants liable under Title IX without establishing that the "deliberate indifference" of an

appropriate person "caused plaintiff students to be subjected to discrimination" and that

"defendants' alleged failure to provide plaintiffs with counseling and other services [after it

had knowledge of the abuse] cannot be the basis to hold defendants liable under Title IX"

because "the alleged failures of defendants in the instant case to provide counseling and other

services to plaintiffs after the Childline Report did not subject plaintiffs to continued sexual

abuse and harassment, or make them more vulnerable to it." (some brackets omitted)).

E

It is clearly established that "a damages remedy will not lie under Title IX unless an

[appropriate] official . . . has actual knowledge of discrimination in the recipient's programs

*and fails adequately to respond*."  *Gebser*, 524 U.S. at 290 (emphasis added).  For a school

district to be liable, "the response must amount to deliberate indifference to discrimination."

*Id.*

> Deliberate indifference under Title IX means that the school's
> response or lack of response was "clearly unreasonable in light
> of the known circumstances."  Neither "negligence nor mere
> unreasonableness is enough."  Schools need not "remedy the
> harassment or accede to a parent's remedial demands," and
> "courts should refrain from second-guessing the disciplinary
> decisions made by school administrators."

*I.L. v. Hous. Indep. Sch. Dist.*, 776 Fed. Appx. 839, 842 (5th Cir. 2019) (quoting *Sanches v.*

*Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167-68 (5th Cir. 2011)).

"[T]here is no reason why courts, on a motion . . . for summary judgment . . . could not

identify a response as not 'clearly unreasonable' as a matter of law." *Sanches*, 647 F.3d at 168 (alterations in original).

Courts in the Fifth Circuit have held that a school district may act with deliberate indifference where it does *nothing* in response to allegations of teacher-on-student sexual abuse.  For example, in *Doe v. Beaumont Independent School District*, 615 F.Supp.3d 471 (E.D. Tex. 2022), when administrators at one school within the Beaumont Independent School District ("BISD") became aware of the sexually inappropriate and predatory behavior of one of its substitute teachers, Brandon Chillow ("Chillow"), the school district failed to take steps reasonably calculated to stop the abuse.  Concluding that the plaintiffs had sufficiently pleaded that BISD had acted with deliberate indifference, for purposes of their Title IX claim, the court explained:

> Chillow's termination at [the first school] involved abusive and harassing conduct that triggered mandatory reporting requirements.  Texas law requires the reporting of *abusive* sexual conduct "involving an educator and a student or minor." Thus, BISD can hardly be said to have acted *reasonably* by failing to report his behavior, or by ignoring such reports, and then transferring him to other campuses within the school district where he was free to continue preying on vulnerable students.  Quite the opposite.

*Id.* (footnote and internal citation omitted).

But when the school district takes some kind of action in response to allegations of sexual abuse, even if the response is imperfect, courts have held that there is not deliberate indifference.  In *Doe ex rel. Doe v. Dallas Independent School District*, 220 F.3d 380 (5th Cir. 2000), for example, the Fifth Circuit held that, although the district was ineffective in

preventing further abuse, its conduct nevertheless did not amount to deliberate indifference. In that case, John Earl McGrew ("McGrew"), a third grade teacher and Boy Scout troop leader at Joseph J. Rhoades Elementary School ("J.J. Rhoades"), sexually molested numerous male students between 1983 and 1987. *Id.* at 381. In 1986, J.H. (a J.J. Rhoades student) reported to Barbara Patrick ("Patrick"), the Principal of J.J. Rhoades, that McGrew had fondled him. *Id.* at 387. Although Patrick investigated J.H.'s allegations, she erroneously concluded that they were unfounded. McGrew was ultimately convicted of one count of aggravated sexual assault and two counts of indecency with a child. After McGrew's criminal conviction, a number of his victims sued Patrick and the Dallas Independent School District, among others, alleging claims under Title IX. This court (Fish, J.) granted summary judgment in the defendants' favor. On appeal, the Fifth Circuit affirmed. It assumed *arguendo* that Patrick had actual notice of an allegation of sexual abuse in the spring of 1986. But it concluded that Patrick had not responded to the allegation of abuse with deliberate indifference. As the panel explained:

> even drawing all reasonable inferences in favor of Plaintiffs, we must agree with the district court that Plaintiffs have failed to create a genuine issue of material fact. Patrick interviewed J.H., spoke with his mother, spoke with J.H.'s teacher, spoke with McGrew and warned him either that he would be "dealt with" if the accusations were founded or that he should avoid acting in a way that could be misconstrued. She concluded, in error, that J.H.'s allegation was not true, and her erroneous conclusion had tragic consequences. However, we cannot say on the facts before us that these actions, though ineffective in preventing McGrew from sexually abusing students, were an inadequate response to J.H.'s allegation.

*Id.* at 388.

Similarly, in *Ramos v. Cremar*, 2017 WL 4512563, at *5 (S.D. Tex. May 12, 2017), *aff'd sub nom. Ramos v. Webb Consol. Indep. Sch. Dist.*, 724 Fed. Appx. 338 (5th Cir. 2018), the court also held that the evidence did not permit the conclusion that the school district had acted with deliberate indifference, even though the school district's actions "were not perfect." *Id.* at *5.  In *Ramos* a ninth-grade student, O.R., had a sexual relationship with his teacher, Fallon Cremar ("Cremar").  *Id.* at *1.  When R.J. Montalvo ("Montalvo"), another teacher at the school O.R. attended, reported to Principal Humberto Soliz ("Soliz") that he had seen O.R. hugging Cremar, an investigation ensued.  *Id.* *2.  O.R. committed suicide two days later, before the investigation concluded.  *Id.* at *1.  O.R.'s family sued the school district, alleging claims under § 1983 and Title IX.   On the question of deliberate indifference, the district court found in the school district's favor.

> Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that neither WCISD nor its officials in charge of supervising Ms. Cremar acted with deliberate indifference in this situation. . . . The morning after Principal Soliz first learned of any potential misconduct by Cremar, he observed O.R. and contacted Cremar to obtain a statement. Sanchez, the superintendent, quickly took action when she learned of the classroom incident: she took over the investigation, directed Teacher Montalvo to prepare a report for Child Protective Services, placed Cremar on administrative leave, and asked Flores to meet with O.R. and see if he was alright.  WCISD and its officials responded to any risks towards O.R.'s rights and well-being, and their responses were a far cry from being "clearly unreasonable."

*Id.* at *5.  The court reasoned that

> WCISD's actions were not perfect.  For example, Plaintiffs
> presented evidence that WCISD failed to follow certain federal
> guidelines or inform O.R.'s family of the investigation.  Yet
> WCISD and its officials still responded reasonably to any
> known risks towards O.R.'s rights. Deliberate indifference
> requires much greater culpability.

*Id.*; *see also*, *e.g.*, *King v. Conroe Indep. Sch. Dist.*, 289 Fed. Appx. 1, 2 (5th Cir. 2007) (per

curiam) (affirming summary judgment in favor of school district on Title IX claim based on

sexual abuse of student by her volleyball coach where principal investigated report that

student and coach were seen kissing and passing notes but erroneously concluded that

allegations were unfounded, noting "[Principal] Stockton met with [Coach] Shupp,

questioned her about the alleged relationship, and, upon receiving a denial, warned her to

keep her relationships with students professional at all times"); *Guerrero v. Brownsville*

*Indep. Sch. Dist.*, 2020 WL 2583134, at *8 (S.D. Tex. May 5, 2020) (granting summary

judgment on teacher-on-student Title IX claim where evidence showed that "rather than

acting with deliberate indifference, BISD placed [teacher] on administrative leave and

directed her not to contact any students within a day of receiving information of [teacher]'s

wrongful conduct"), *rec. adopted*, 2020 WL 2596788 (S.D. Tex. May 21, 2020).

The summary judgment record in this case demonstrates that Uplift took timely and

plausibly reasonable measures to investigate and end Wazed's sexual harassment of students.

Frazier immediately placed Wazed on administrative leave after receiving A.C.'s email

alleging that J.G. had reported that Wazed kissed her.  The Administrators then investigated

A.C.'s allegations by interviewing J.G. and four other students from Wazed's 2018-2019

- 22 -

kindergarten class.   They also interviewed Wazed and immediately terminated his employment with Grand Primary.  In addition, Uplift filed a report with the SBEC and CPS and contacted A.C., the parent who had initially reported the abuse, to inform her that Wazed had been terminated.

J.T. maintains that Uplift should have done more.  She contends that it should have taken "the kinds of actions that would address the full scope of the damages caused by Wazed's abuse," P. Br. (ECF No. 138) at 26 (emphasis omitted), including, at a minimum, informing M.L.'s parents that M.L. had reported that Wazed kissed her on the cheek, "probing deeper" during its investigation of Wazed after all four of the female students it interviewed reported abuse, and immediately reporting the abuse to SBEC or CPS, rather than waiting for more than two weeks.

But the fact that Uplift might have done more or responded differently does not, without more, establish deliberate indifference.  *See, e.g.*, *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007) ("[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference.").  Deliberate indifference in the Title IX context is a "high bar" and requires the defendant's response to be "clearly unreasonable in light of the known circumstances."  *Roe*, 53 F.4th at 341 (quoting *Sanches*, 647 F.3d at 167).  Neither "negligence nor mere unreasonableness is enough."  *Sanches*, 647 F.3d at 167; *see also id.* at 170 ("Title IX does not require flawless investigations or perfect solutions.").

Considering the summary judgment record in this case, a reasonable jury could not find that Uplift's response to the reported incidents involving Wazed was clearly

unreasonable or amounted to "an official decision . . . not to remedy the violation." *Gebser*,

524 U.S. at 290.  Accordingly, because J.T. has failed to create a genuine issue of material

fact on the question wehther Uplift acted with deliberate indifference after the fact, the court

grants Uplift's motion for summary judgment on this claim.

IV

Uplift also moves for summary judgment on J.T.'s § 1983 claim.

A

Section 1983 provides a remedy against any "person" who, "under color of any

statute, ordinance, regulation, custom, or usage, of any State," violates another's rights under,

*inter alia*, the United States Constitution.  42 U.S.C. § 1983.  A municipal entity, such as a

public school district,[13] is considered a "person" under § 1983.  *Moore v. Willis Indep. Sch.

Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) ("A local government entity, such as a school

district, may be held liable under § 1983 for constitutional violations committed pursuant to

a governmental policy or custom." (citing *Monell v. Dept. of Soc. Servs. of N.Y.*, 436 U.S.

658, 690 (1978))).  But a school district cannot be held vicariously liable under § 1983 for

the individual acts of its employees.  *See Monell*, 436 U.S. at 691.  Instead, to establish

municipal liability, a plaintiff must prove "(1) an official policy (or custom), of which (2) a

policy maker can be charged with actual or constructive knowledge, and (3) a constitutional

---

[13]The court will assume, as Uplift does in its motion, that an open-enrollment public charter school, such as Uplift, is also subject to § 1983 liability under *Monell*.  *See* D. Br. (ECF No. 119) at 33.

violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291

F.3d 325, 328 (5th Cir. 2002) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th

Cir. 2001)).

      The first requirement can be shown by

> a policy statement, ordinance, regulation, or decision that is
> officially adopted and promulgated by . . . an official to whom
> the lawmakers have delegated policy-making authority" or
> through a "persistent, widespread practice of city officials or
> employees, which, although not authorized by officially adopted
> and promulgated policy, is so common and well settled as to
> constitute a custom that fairly represents municipal policy."

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam).  Under

the second requirement, a plaintiff must show "[a]ctual or constructive knowledge of [a]

custom" that is "attributable to the governing body of the municipality or to an official to

whom that body ha[s] delegated policy-making authority."  *Id*.; *see also Valle v. City of

Houston*, 613 F.3d 536, 542 (5th Cir. 2010).  Under the third requirement, a plaintiff must

establish "moving force" causation by showing "that the municipal action was taken with the

requisite degree of culpability" and "a direct causal link between the municipal action and

the deprivation of federal rights."  *Valle*, 613 F.3d at 542 (quoting *Bd. of the Cnty. Comm'rs

v. Brown*, 520 U.S. 397, 404 (1997)).

      The parties agree that the policymaker in this case is the Uplift Board of Directors

("Uplift Board").  And the court will assume *arguendo* that Wazed's sexual assaults of M.L.

- 25 -

deprived her of a right secured by the Constitution.[14]   J.T.'s § 1983 claim thus turns on whether she has introduced sufficient evidence for a reasonable jury to find that an official policy or custom, of which the Uplift Board had actual or constructive knowledge, was the moving force behind the deprivation of M.L.'s constitutional right.

B

J.T. contends first that, at the time Wazed was abusing M.L., "officially promulgated Uplift Board policy *permitted* teachers to be alone with students in secluded environments within their darkened classrooms," and that the sexual abuse in this case resulted from Uplift's failure to adopt "any policy prohibiting teachers from dimming or turning off their classroom lights, barring teachers from being alone in secluded classrooms with students, or preventing teachers from maintaining features in their classrooms that would keep sexual abuse hidden."[15]  P. Br. (ECF No. 138) at 35.

1

In instances where the policymaker "fails to act affirmatively at all"—i.e., where there is no policy—the "official policy" requirement may be met "if the need to take some action

_____

[14]Uplift challenges J.T.'s equal protection claim as duplicative of her substantive due process claim, D. Br. (ECF No. 119) at 32-33 & 32 n.50, but does not maintain that Wazed did not violate her right to substantive due process.  Because the court is granting summary judgment on a different basis, it will assume without deciding that Wazed's sexual assaults of M.L. deprived her of a Fourteenth Amendment right secured by the Constitution.

[15]Uplift argues in its reply that J.T. did not plead an "absence of policy" theory in her second amended complaint and that she cannot raise a new theory of liability in her response. Because the court is granting Uplift's motion for summary judgment on this theory of liability, it will assume *arguendo* that it has been adequately pleaded.

to control the agents of the local governmental entity 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] . . . can reasonably be said to have been deliberately indifferent to the need.'" *Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (alteration in original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  As with J.T.'s failure-to-train theory, which the court addresses below, *see infra* § IV(D), to succeed on her insufficient-policy theory, J.T. must establish that Uplift acted with deliberate indifference.  *See Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) ("Liability for failure to promulgate policy and failure to train or supervise both require that the defendant have acted with deliberate indifference.").

"A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequence[] of not adopting a policy will be a deprivation of constitutional rights." *Id.* (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).  "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'"  *Valle*, 613 F.3d at 542 (quoting *Piotrowski*, 237 F.3d at 579).  To establish deliberate indifference, J.T. must show that Uplift had "actual or constructive notice" that a particular omission in policy would cause its "employees to violate citizens' constitutional rights" and that it still chose to omit that policy.  *See Porter*, 659 F.3d at 447 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)); *see also Connick*, 563 U.S. at 62 (A "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [defendant] itself to violate the Constitution.'"

(citation omitted)).

A plaintiff may show deliberate indifference in either of two ways.  "First, a plaintiff may demonstrate 'that a municipality had notice of a pattern of similar violations.'" *Davidson v. City of Stafford*, 848 F.3d 384, 397 (5th Cir. 2017) (quoting *Kitchen v. Dall. Cnty.*, 759 F.3d 468, 484 (5th Cir. 2014)) (failure-to-train case).  "Second, a plaintiff may demonstrate liability based on a single incident if the constitutional violation was the highly predictable consequence of a particular failure [to promulgate a policy]."  *Id.* (internal quotation marks omitted) (quoting *Kitchen*, 759 F.3d at 484).

2

J.T. does not contend that the Uplift Board had notice of a pattern of similar instances of teacher-on-student sexual abuse within its campuses.  Accordingly, to prevail on her inadequate-policy theory of liability, J.T. must adduce evidence that the constitutional violation in this case was the "highly predictable consequence" of Uplift's failure to promulgate the suggested policies—i.e., policies prohibiting teachers from dimming or turning off classroom lights, being alone in secluded classrooms with students, or maintaining features in their classrooms that would hide sexual abuse.  *Davidson*, 848 F.3d at 397.

In her response brief, J.T. relies on the opinion of her expert, John F. Doherty, Ed.D. ("Dr. Doherty"), to argue that there was an "obvious risk of sexual abuse created by the activities [Uplift] tolerated."  P. Br. (ECF No. 138) at 36.  She quotes from Dr. Doherty's expert report, in which he opines:

> Uplift failed to effectively implement its physical safety policy which prohibited classroom teachers from having secluded areas and/or darkened rooms, which in the field of education is considered a red flag and may encourage and provide an opportunity for sexual abuse and/or other misconduct by adults toward children.

P. App. (ECF No. 141) at 329. But Dr. Doherty's opinion that permitting secluded areas or darkened rooms is considered a "red flag" in the field of education that "may" encourage and provide an opportunity for abuse is insufficient to enable a reasonable jury to find that Uplift knew or should have known that its failure to adopt the specific policies J.T. describes was highly likely to result in the sexual abuse of its students, including M.L.[16]

J.T. fails to point to any other evidence that would support the reasonable finding that the sexual abuse of students was a "highly predictable consequence" of Uplift's failure to adopt a policy specifically prohibiting teachers from dimming or turning off classroom lights, being alone in secluded classrooms with students, or maintaining features in their classrooms that would keep sexual abuse hidden. Accordingly, the court grants Uplift's motion for summary judgment on J.T.'s § 1983 claim to the extent it is based on an insufficient-policy theory.

---

[16]J.T. contends that it was "obvious to the Carrollton Independent School District . . . that dark and secluded classrooms presented a risk of abuse." P. Br. (ECF No. 138) at 36. The evidence she cites in support of this proposition, however, is insufficient to create a genuine issue of material fact. Wazed's after-the-fact speculation, based on his own experience, that sexual abuse "can happen when lights are dimmed in classrooms," P. App. (ECF No. 141) at 128, would not enable a reasonable jury to find that the sexual abuse of students was a "highly predictable consequence" of Uplift's failure to adopt a policy prohibiting teachers from dimming or turning off the lights in their classrooms.

C

J.T. contends next that Uplift maintained a persistent, widespread custom of facilitating Wazed's sexual abuse of his students.

1

Uplift points to the absence of evidence of a widespread pattern of sexual abuse to show a board custom, and it contends that there are no allegations or evidence that the Uplift Board was ever aware of any widespread pattern of educator sexual misconduct with students or inappropriate response to such allegations.

J.T. responds that Uplift had an "informal custom or practice" of tolerating and facilitating Wazed's abuse of the children in his charge; that the evidence shows that Wazed sexually abused at least seven girls, "and perhaps . . . all the girls in his class," P. Br. (ECF No. 138) at 39; that the evidence reasonably suggests that Wazed could have engaged in hundreds of acts of abuse during his 1½ years at Uplift; that Uplift's custom or practice extended to covering up known instances of sexual abuse by any available means after August 2019; that, at a minimum, the Uplift Board had constructive knowledge of Wazed's abuse because "the Board would have surely noticed the signs of Wazed's sexual abuse of his students if it had even made casual visits to the school, given that the signs of his abuse were observable to anyone walking down the hallway, and appeared possibly several times a week," *id.* at 41-42; and that Uplift's "customary laxity" was the moving force behind Wazed's unconstitutional sexual abuse of M.L. "because Wazed's abuse required the seclusion that Uplift's customary laxity permitted.," *id.* at 42.

2

"An official policy 'usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Covington v. City of Madisonville*, 812 Fed. Appx. 219, 225 (5th Cir. 2020) (per curiam) (quoting *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009)). A "pattern of conduct" is necessary when the municipal actors are not policymakers. *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 169 (5th Cir. 2010). "A pattern requires similarity and specificity; [p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question. . . . A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (citations omitted). If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Id.* at 850.

3

The court will assume *arguendo* that Wazed did engage in hundreds of acts of abuse during his 1½ year tenure at Uplift, as J.T. argues, and that at least one other person (Walker) witnessed and failed to report his abuse. Even so, a reasonable jury could not find, based on these facts, that Uplift had a custom of tolerating the sexual abuse of its students. J.T. has

not produced evidence that any other teacher at Uplift sexually abused his or her students or

that any other teacher at Uplift (or person with greater responsibility, such as the Academic

Director) witnessed and failed to report a teacher's sexual abuse.  The summary judgment

evidence would only permit the reasonable finding that one Uplift classroom teacher

repeatedly abused his students and that, on one occasion, an Uplift Teacher Aide witnessed

and failed to report that abuse.  "[I]solated acts" such as these cannot establish the existence

of a custom or practice.  *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).

And J.T. has failed to adduce sufficient evidence to support the reasonable finding that

tolerance of sexual abuse is the expected, accepted practice of Uplift employees.  *Peterson*,

588 F.3d at 851.[17]

Even if a widespread pattern or practice could be established by evidence of a single

teacher's repeated acts of sexual abuse, Uplift would still be entitled to summary judgment

on J.T.'s § 1983 claim because J.T. has failed to adduce any evidence that any member of the

Uplift Board had actual or constructive knowledge that Wazed was sexually abusing

students.  "Actual or constructive knowledge of [a] custom must be attributable to the

---

[17]J.T. argues in her response brief that "[i]n denying Uplift's motion to dismiss
Plaintiff's Second Amended Complaint, the Court held that if this custom turned out to be
as 'persistent and widespread' as Plaintiff alleged in that complaint, then Plaintiff would be
able to recover on a section 1983 claim."  P. Br. (No. 138) at 39.  But in denying Uplift's
motion to dismiss J.T.'s second amended complaint, the court accepted as true J.T.'s
allegation that Uplift had a "persistent and widespread custom of tolerating and facilitating
Wazed's sexual abuse of young girls in his charge."  *J.T. II*, 2022 WL 283022, at *2.  At the
summary judgment phase, the court is not required to accept this allegation as true, and J.T.
is obligated to introduce evidence that raises a genuine issue of material fact.

governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Webster*, 735 F.2d at 841.  Although actual knowledge on the part of the policymaker must be shown directly, "[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)*.*

J.T. does not contend that the Uplift Board had actual knowledge of Wazed's repeated acts of sexual abuse.   Nor does she maintain that, had it properly exercised its responsibilities, the Uplift Board would have known that Wazed was sexually abusing his students.  She instead argues that

> the Board would have surely noticed the signs of Wazed's sexual abuse of his students if it had even made casual visits to the school, given that the signs of his abuse were observable to anyone walking down the hallway, and appeared possibly several times a week.  They would have been just as easy to discover as "public" conversations floating in the hallway or traveling through the staff breakroom.

P. Br. (ECF No. 138) at 41-42.  But J.T.'s speculation about what a member of the Uplift Board "surely" would have seen by visiting the Grand Primary campus is not sufficient to defeat summary judgment.  *See Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").   Moreover, to the extent that the phrase "signs of Wazed's sexual abuse" refers to the conditions of Wazed's classroom, a reasonable jury could not find that these conditions were the "moving force" behind Wazed's

- 33 -

sexual abuse.  *See, e.g.*, *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th

Cir. 2015) ("The 'moving force' inquiry imposes a causation standard higher than 'but for'

causation." (citation omitted)); *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir.

1992) ("[A] direct causal connection must exist between the policy and the alleged

constitutional deprivation.  This connection must be more than a mere 'but for' coupling

between cause and effect.  To form the basis of liability under § 1983, a municipal policy

must be affirmatively linked to the constitutional violation and be the moving force behind

it." (citations omitted)).   A reasonable jury could only find that Wazed's classroom

conditions were merely the tools that Wazed used to hide his illegal, predatory conduct.

Accordingly, even if the evidence would enable a reasonable jury to find that the Uplift

Board had constructive knowledge of the *conditions of Wazed's classroom*, a reasonable jury

could not find that the Uplift Board had constructive knowledge of any custom that was the

moving force behind the violation of M.L.'s constitutional right.   Accordingly, the court

holds that Uplift is entitled to summary judgment dismissing J.T.'s § 1983 claim to the extent

it is based on an alleged custom or practice.

D

J.T. also asserts failure-to-train and failure-to-supervise theories of liability under

§ 1983.

1

"[T]here are limited circumstances in which an allegation of a 'failure to train' [or

failure to supervise] can be the basis for liability under § 1983."  *City of Canton*, 489 U.S.

- 34 -

at 387.  To succeed on a failure-to-train or failure-to-supervise claim, a plaintiff must be able
to show: (1) the training procedures or supervision of employees was inadequate, (2) a causal
link between such failure and the violation of plaintiff's constitutional rights, and (3) such
failure amounts to deliberate indifference.  *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th
Cir. 2009) (citation omitted).  "'Deliberate indifference' is a stringent standard of fault,
requiring proof that a municipal actor disregarded a known or obvious consequence of his
action."  *Connick*, 563 U.S. at 61 (brackets and citation omitted).  Thus when a
municipality's policymakers are on actual or constructive notice that a particular omission
in their training program causes municipal employees to violate citizens' constitutional
rights, the municipality may be deemed deliberately indifferent if the policymakers choose
to retain that program.  *Id*.

As with inadequate policy cases, "[p]roof of more than a single instance of the lack
of training or supervision causing a violation of constitutional rights is normally required
before such lack of training or supervision constitutes deliberate indifference."  *Thompson
v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001).  In the absence of a pattern of similar
violations, a plaintiff may sometimes "establish deliberate indifference through the
single-incident exception."  *Hutcheson v. Dall. Cnty.*, 994 F.3d 477, 482 (5th Cir. 2021).  To
fit within this "extremely narrow" exception, the plaintiff must show "that the highly
predictable consequence of a failure to train would result in the specific injury suffered."
*Valle*, 613 F.3d at 549 (emphasis omitted).  "For a violation to be 'highly predictable,' the
municipality 'must have failed to train its employees concerning a clear constitutional duty

implicated in recurrent situations that a particular employee is certain to face.'" *Hutcheson*, 994 F.3d at 482-83 (quoting *Littel v. Hous. Indep. Sch. Dist.*, 894 F.3d 616, 624-25 (5th Cir. 2018)). "The single-incident exception 'is generally reserved for those cases in which the government actor was provided no training whatsoever.'" *Id*. at 483 (quoting *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018)). Similarly, to establish liability for a failure to supervise, "it must have been obvious that the highly predictable consequence of not [supervising the employees] was that they would" commit the specific constitutional violation alleged. *Peterson*, 588 F.3d at 849 (internal quotation marks and citation omitted).

2

Uplift moves for summary judgment on J.T.'s § 1983 claim based on an alleged failure to train and supervise, contending, *inter alia*, that it *did train* Wazed and informed him that Uplift prohibits sexual abuse; that J.T. cannot identify any deficiencies in the training provided to Uplift employees; that even if J.T. could show an inadequacy in Uplift's training of its employees, there is no evidence that the Uplift Board knew of such inadequacy and responded with deliberate indifference; that the evidence shows that Uplift's administrators *did* supervise the teachers at Grand Primary; and that even if J.T. could show an inadequacy in supervision, there is no evidence that the Uplift Board was aware of any deficiency and responded with deliberate indifference.

J.T. responds that Uplift's training and supervision of Wazed were inadequate because Uplift failed to inform its teachers that they should not darken their classrooms or erect barriers creating areas of seclusion within them, failed to train its staff to be on the lookout

- 36 -

for such features and react to them, and failed to ensure that its administrators actually patrolled with enough vigilance to see those features; that "the requisite 'knowledge' can be demonstrated through Uplift's 'constructive knowledge,' which Uplift Board members would have acquired if they ever walked the halls and saw the obvious almost daily signs of Wazed's abuse," P. Br. (ECF No. 138) at 43; that the training and supervision failures at issue in this case "directly caused" the violation because Wazed testified that he would have followed such training and been deprived of the temptation to abuse his students; that there is a material issue of disputed fact about whether Wazed received any training on sexual abuse; that if Uplift administrators had been required to conduct patrols of the hallways, look for features of a secluded classroom environment, and take action to prevent them, M.L. would not have been assaulted; and that Uplift acted with "deliberate indifference" under the "single incident" exception because there is a direct line between Uplift's failure to enforce its policies for protecting student safety and the violations of student safety that resulted and there is evidence that Wazed received "no training whatsoever" on sexual harassment and avoiding environments of seclusion that create the risk of abuse.

3

The court holds that Uplift is entitled to summary judgment on J.T.'s § 1983 claim based on an alleged failure to train or supervise. Uplift has presented evidence that it had several policies in place to prevent the sexual abuse of its students. As a condition of accepting his offer of employment, Uplift required Wazed to acknowledge its policy prohibiting discrimination and harassment, including sexual harassment, and to agree to

comply with the Employee Handbook. Before each school year, Uplift provided Wazed training on recognizing and reporting suspected child abuse and its prohibition of sexual harassment, and Wazed passed quizzes to show he understood the materials. Wazed also attended training by Grand Primary's Social Counselor on CPS reporting, and, each year, Wazed acknowledged that he reviewed and would comply with the Employee Handbook, including the prohibition of student harassment and obligation to report threats to students. Regarding the supervision of teachers, Uplift has presented evidence that it expects Academic Directors and Deans to routinely enter classrooms and walk the hallways of their campus every day, unless other obligations prevent them from doing so; that Grand Primary's leadership made it a practice to walk the halls on a daily basis; and that Administrators conducted multiple formal observations of Wazed's teaching performance each school year, in excess of the minimum required under Texas law in traditional public schools. In the face of this evidence, J.T. has failed to create a genuine issue of material fact on the question whether Uplift was deliberately indifferent to the risk of sexual abuse of its students.

J.T. focuses her response arguments on Uplift's alleged failure to train and supervise regarding the conditions of Wazed's classroom, arguing that

> Uplift failed to convey any expectation to Wazed or other teachers that they should not darken their classrooms or erect barriers creating areas of seclusion within them. Uplift also failed to convey any expectation to Wazed's supervisors that they must be on the lookout for such features and practices and react to them. And Uplift failed to ensure that administrators actually patrolled with enough vigilance to see those features.

P. Br. (ECF No. 138) at 43. But she has not adduced any evidence of a pattern of prior

incidents of sexual abuse that had anything to do with classroom lighting or barriers or evidence that the Uplift Board was aware of any such prior incidents and deliberately chose to do nothing. *See Thompson*, 245 F.3d at 459.

To the extent that J.T. attempts to rely on the "extremely narrow" single incident exception, *Valle*, 613 F.3d at 549, she has not adduced any proof that Uplift failed to provide any training whatsoever "concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face," *City of Canton*, 489 U.S. at 396 (O'Connor, J., concurring).  And she has failed to introduce any evidence to support her conclusory assertion that "there is a direct line between Uplift's failure to enforce its policies for protecting student safety, and the violations of student safety that resulted." P. Br. (ECF No. 138) at 46.  Moreover, as discussed above, *see supra* § IV(B)(2), based on the summary judgment record, a reasonable jury could not find that the sexual assault of students was the "highly predictable consequence" of a failure to train and supervise teachers on how they lighted and laid out their classrooms.

Accordingly, because a reasonable jury could not find that Uplift acted with deliberate indifference in failing to train or supervise its employees, the court grants Uplift's motion for summary judgment with respect to J.T.'s § 1983 failure to train or supervise claim.

\*    \*    \*

Accordingly, for the reasons explained, the court grants Uplift's motion for summary judgment and dismisses this action with prejudice by judgment filed today.

**SO ORDERED**.

June 27, 2023.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 40 -